Estate of Sarah Howard Mitchill, Deceased, Catharine Mitchill, Executrix v. Commissioner.
Estate of Mitchill v. Commissioner
Docket No. 90453.
United States Tax Court
T.C. Memo 1962-91; 1962 Tax Ct. Memo LEXIS 217; 21 T.C.M. (CCH) 486; T.C.M. (RIA) 62091; April 23, 1962
Roland J. Christy, Esq., 110 Windsor Ave., Philadelphia, Pa., for the petitioner. Frederick A. Levy, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in estate tax in the amount of $4,745.03. The only question presented is whether at the time of her death the decedent, Sarah Howard Mitchill, had an enforceable claim in the amount of $17,500 against her son, Warren Latham Mitchill. Findings of Fact The facts stipulated by the parties are incorporated herein by this reference. Sarah Howard Mitchill, hereinafter referred to as the decedent, died testate on July 3, 1956, at the age of 78. The decedent's estate, represented by the executrix under her will, Catharine Mitchill (the decedent's daughter), now Catharine Mitchill *218 Luck, is petitioner herein. On October 2, 1957, petitioner filed a Federal estate tax return with the district director of internal revenue, Philadelphia, Pennsylvania. Prior to 1954 the decedent's son, Warren Latham Mitchill, hereinafter referred to as Warren, told the decedent that he would like to have his own commercial automotive service garage and that he would be willing to relinquish any possible inheritance if the decedent would assist him in acquiring such a garage. The decedent and Warren investigated several possible garage properties but did not find any which they considered good purchases at that time. Warren, therefore, requested and received permission from the decedent to construct a garage on one end (bordering the highway) of the decedent's farm property in East Caln Township, Chester County, Pennsylvania. The decedent told Warren that she would furnish the monies as needed to construct and equip the garage, provided that Warren in constructing the garage would use a contractor who had done work for the decedent in prior years. Warren agreed to this condition. Warren attempted to borrow money from the Downingtown National Bank of Downingtown, Pennsylvania, to *219 finance the construction of the garage himself. He was unsuccessful in this attempt, and the decedent agreed to jointly sign a note to the bank and put up her collateral to secure all borrowed funds. Construction of the garage started early in 1954 and was completed in February of 1955. Constructing and equipping the garage were financed both by funds borrowed from time to time from the Downingtown National Bank in the total amount of $53,000 and additional funds supplied to Warren by the decedent in the total amount of $17,500. Thus, $70,500 was the aggregate amount spent on the project. Warren personnally supervised the construction and equipping of the garage and served as the disbursing agent of the funds used. Warren informed the decedent as the construction went along what the monies were being used for; however, there was no formal accounting, and Warren did not sign or give any note to the decedent for the $17,500 which she personally supplied. Prior to her death the decedent never requested that Warren return any of such funds. On February 15, 1955, the decedent and Warren together signed a bank loan note to the Downingtown National Bank in the amount of $53,000, which *220 renewed and consolidated prior borrowings. The collateral for such note was all supplied by the decedent. Warren paid the interest on this note when it came due thereafter. After the garage was completed in February, 1955, Warren considered the garage his. He operated the garage without interference from the decedent, and he paid all of the garage's expenses. On his Federal income tax return, Warren claimed a deduction for depreciation on the cost of the garage and its equipment. The construction cost of the garage building was claimed to be approximately $45,000 on Warren's income tax return. Neither the garage nor the portion of the decedent's farm land on which the garage is located was ever deeded to Warren by the decedent prior to her death. On May 26, 1955, the decedent executed her last will and testament, and it was this will which was probated after her death. The will provided, in part, as follows: Fourth: I give and devise to the First National Bank of West Chester, Pennsylvania, and its successors in trust, IN TRUST NEVERTHELESS all that certain garage recently constructed by my son, Warren Latham Mitchill, together with the following described land, (being part *221 of my farm in East Caln Township, Chester County, Pennsylvania), on which said garage is constructed, namely; bounded on the southerly side by the creek - on the westerly side by the lane fence to my said property - on the northerly side by the Lincoln Highway - and on the easterly side by my property line extending from said highway to said creek -, to Hold and manage the same and to collect the income therefrom and pay over the same, less said trustee's commissions and maintenance expenses to my son, Warren Latham Mitchill, during his lifetime, and at and immediately after his decease to convey the same or pay over the proceeds thereof to his then living children and the issue of his deceased children per stirpes. And I hereby authorize said trustee to permit my said son to occupy and use the said garage property, (subject to such terms as may be satisfactory to said trustee for the discharge of said commissions and said expenses). And I hereby authorize and empower said trustee in its discretion to sell and convey said garage and land to a purchaser or purchasers free of this trust if it appears for the advantage of the beneficiaries of said trust, and when the same shall be reduced *222 to money then to invest and hold the net proceeds for the same trust purposes, hereby giving my said trustee full discretion in the selection and choice of such investments, not confining the trustee to so-called legal investments for trustees. If however my son, Warren Latham Mitchill, has at the time of my decease repaid to me the sum of $17,500.00 (seventeen thousand five hundred dollars), which I have lent to him, and shall then have paid and discharged the obligation of fifty-three thousand dollars I have incurred with the Downingtown National Bank, (or pledged my securities therefor), in that event my said trustee shall grant and convey to him the aforesaid garage and land free and discharged of the aforesaid trust; and, if said sums have been paid and my said liability discharged by my son at the time of my decease, IN THAT EVENT ONLY I also give and bequeath to him (in addition to the garage property free of said trust) the sum of seventy thousand dollars absolutely. Subsequent to the drafting and signing of her will, the decedent and Warren on June 8, 1955, signed an agreement, the pertinent portions of which were as follows: That Whereas there has been constructed recently *223 upon the farm property of the said Sarah Howard Mitchill situate in East Caln Township, Chester County, Pennsylvania, a service station with garage and curtilage * * *. And Whereas the sums of $17,500.00 and $52,000.00 have been furnished by the said Sarah Howard Mitchill to construct said curtilage with such improvements as are part of said curtilage, the said sum of $52,000.00, being money borrowed from the Dowingtown National Bank and on account of which said Bank holds securities belonging only to Sarah Howard Mitchill together with her obligation and the obligation of said Warren Latham Mitchill. And Whereas it is the purpose of the parties hereto that the said Sarah Howard Mitchill shall give and grant to the said Warren Latham Mitchill the option and privilege of purchasing said curtilage with such improvements as may belong thereto; NOW THEREFORE the said Sarah Howard Mitchill, for and in consideration of the sum of one dollar to her in hand paid by the said Warren Latham Mitchill, the receipt of which she does hereby acknowledge, does hereby give and grant unto the said Warren Latham Mitchill the right, option and privilege, for and during the term of her natural lifetime, *224 to purchase said curtilage with such improvements as may belong thereto, for the gross sum of $69,500.00 with such instalments of interest as shall or may accrue on said $52,000.00 now owed to said Bank, (which said interest charges the said Warren Latham Mitchill has and does hereby expressly assume); and it is hereby further expressly understood and agreed that when and as the said Warren Latham Mitchill shall pay in sums of $1,000.00 or multiples thereof reductions of said $69,500.00 the aforesaid purchase price of $69,500.00 shall be commensurately reduced in his favor and behalf; and it is hereby further acknowledged that said Warren Latham Mitchill is now and has been in possession of said curtilage as tenant at the Will of the said Sarah Howard Mitchill. The agreement incorrectly stated that $52,000 had been borrowed from the Downingtown National Bank. In fact, $53,000 had been so borrowed. The agreement of June 8, 1955 was originally suggested by Warren's bookkeeper as a means of showing Warren's claim to the garage on the decedent's property and of evidencing his right to possession thereof. At the time of the decedent's death on July 3, 1956, Warren had neither paid *225 the decedent $17,500 nor repaid the bank loan in the amount of $53,000 at the Downingtown National Bank. On the Federal estate tax return filed by the petitioner, a "commercial garage" was listed under Schedule A as an asset belonging to the decedent with a value of $53,000 as of the date of her death. The items of personal property (movable equipment) used in connection with the garage were not included within such valuation, nor were they separately accounted for in the estate tax return. In Schedule K of the estate tax return, a debt of the decedent owed to the Downingtown National Bank in the form of a collateral note in the amount of $53,000 was listed. In Schedule C of such return, on which mortgages, notes, and cash owned by the decedent at the time of her death are to be listed and described, there was included the following entry: Warren Latham Mitchell
Note for $17,500.00
no value At the time of filing the estate tax return, the executrix had no such note in her possession. The above entry was made on the basis of the language in the decedent's will that the decedent had "lent" Warren the sum of $17,500. It was listed as having "no value" because *226 the executrix understood and believed that any money that the decedent had let Warren have the decedent had not intended to collect and that, therefore, the estate would make no attempt to collect it. The executrix, at the time the estate tax return was filed, had no knowledge of the existence of the agreement of June 8, 1955 between the decedent and Warren. The executrix did not learn of the existence of such agreement until sometime during the year 1961. Since the decedent's death, the decedent's estate has made no demand upon Warren for return of any sums the decedent furnished in connection with the building and equipping of the garage. Under the decedent's will, the garage is presently held in trust for the benefit of Warren during his lifetime. The garage is not in Warren's possession; it is now leased by the trustee to an automobile agency. In the deficiency notice sent to petitioner, the Commissioner determined that Warren was indebted to the decedent in the amount of $17,500 at the time of the decedent's death and that such amount should have been included as the value of this obligation in the estate tax return. This adjustment is the only matter presently in dispute. *227 The decedent at the time of her death did not hold an enforceable obligation in the amount of $17,500 against Warren. Opinion RAUM, Judge: Section 2033 of the 1954 Code provides that for purposes of the Federal estate tax the value of the gross estate of a decedent shall include the value of all property (except real property situated outside of the United States) to the extent of the decedent's interest therein at the time of his or her death. At issue in the instant case is whether the Commissioner correctly determined that the petitioner's decedent held an enforceable claim in the amount of $17,500 against her son Warren at the time of her death which was not included in the reported gross estate on petitioner's estate tax return. [1] The question of whether such an enforceable claim existed is essentially one of fact based upon all of the available evidence, and by our ultimate finding above we have resolved it in petitioner's favor. We think that no enforceable claim existed against Warren at the decedent's death, and we have so found as a fact. *228 There is no question that the decedent actually did give Warren $17,500 sometime in 1954 or 1955 in connection with the construction and equipping of a commercial automotive service garage on a section of the decedent's farm land. The dispute is over whether this money was lent to Warren with the usual obligation to repay, as determined by the Commissioner, or whether it was given to Warren in such circumstances that it did not constitute a loan, as contended by petitioner, with the result that Warren was not obligated to the decedent at her death. Without restating all of the relevant facts set forth in our findings, it is clear on this record that the decedent sometime prior to 1954 decided to help her son Warren obtain the commercial garage that he wanted to own and operate. Warren accepted such help with the belief that the garage would be his in place of any future inheritance from the decedent. The construction and equipping of the garage in 1954 and 1955 cost a total of $70,500. The decedent supplied $17,500 of such amount from her own resources, and the remaining $53,000 was borrowed from a bank on a note jointly signed by the decedent and Warren, but secured by only the *229 decedent's collateral. Although Warren considered the garage his when it was completed, the decedent prior to her death in fact never passed title to either the garage or the land on which it was built. Instead, she allowed Warren to occupy the garage and run a business there as a tenant at will, she granted him an option to purchase the garage from her for $69,500 or the $70,500 [2] which she had paid or obligated herself to pay for it, and she provided in her will that if Warren exercised the option before her death the garage would be his together with a $70,000 cash bequest from her estate. However, if the option had not been so exercised, the will provided that the garage was to be held in trust, with Warren as the life beneficiary thereof and his living children and the issue of his deceased children as remaindermen. *230 We think it is evident on the basis of this record, and particularly on the basis of the decedent's will and the option agreement considered jointly, that the decedent hoped that Warren might be successful in the that Warren might be successful in the garage business prior to her death and that he would be able during her lifetime to buy the garage from her by reimbursing the $17,500 which she had put into the project and discharging the $53,000 loan which had been borrowed on her collateral at the bank. If Warren was able to do this, the decedent provided a substantial cash bequest to Warren in her will. If Warren was unable to do it, the decedent provided a life interest in the garage for Warren and no cash bequest. In any event, Warren was to have the use and benefit of the garage that he had wanted. In these circumstances, we think that no obligation was ever created nor intended to be created for Warren to repay the decedent the subject $17,500. Warren received such money under the impression that it was an advancement in lieu of a later inheritance. The decedent never requested that he repay the $17,500 during her lifetime, but only offered in the option agreement to sell *231 the garage to Warren if he elected to so pay her and to discharge their joint loan from the bank. It is true that the decedent's will speaks of the possibility of Warren repaying the $17,500 "which I have lent to him". However, we doubt that the decedent intended to use the word "lent" in the legal sense of a bona fide past loan. Rather, we think she used it as a synonym for advanced or supplied for his benefit and that such money was, in fact, given Warren with the hope but not the obligation or even expectation that he would be able to make repayment out of the garage business before her death. Such construction of the language used in the will is consistent with the option agreement between the decedent and Warren, which was signed after the execution of the will and which made no mention of the $17,500 having been lent to Warren. As a matter of logic, the very presence of this option agreement argues against the existence of any obligation on Warren's part to pay the decedent $17,500. If Warren had owed her such amount in all events, the decedent hardly would have offered to sell him the garage for a price in excess of the $53,000 which was owed to the bank on a note secured *232 by her collateral. We cannot believe that the decedent intended to make a profit of $17,500 if the intrafamily option had been exercised. Estate of Theodore O. Hamlin, 9 T.C. 676, cited by the Commissioner, is distinguishable on its facts. Not only was there evidence in that case that the decedent treated the advances made to his daughter as a loan during his lifetime, there was also present an instrument from the daughter to the decedent acknowledging receipt of the funds and specifically deferring repayment until her death. No comparable evidence appears in the instant record. We conclude that the petitioner has proved that Warren was not obligated at the time of the decedent's death to pay her $17,500, that such amount was not includible in the decedent's gross estate, and that the Commissioner's determination to the contrary is in error. Decision will be entered under Rule 50. Footnotes
1. As indicated in the findings, the estate tax return did report a note from Warren to the decedent for $17,500 with "no value" at the decedent's death. However, there is no suggestion in the record that there was any such note. The dispute is, even in the absence of a note or other evidence of obligation, whether Warren was in fact legally obligated to his mother, the decedent, in the amount of $17,500 at her death. If there was such an obligation for $17,500, the decedent's gross estate would have to be increased by the value of such obligation.↩
2. The agreement of June 8, 1955, which contained the option arrangement, was actually for a price of $69,500 and not $70,500. As noted in the findings, this occurred because the agreement erroneously referred to the loan from the bank being in the amount of $52,000, not $53,000. It appears that this was a mutual mistake of fact and that $70,500, the true cost of the equipped garage, was the intended option price.↩